IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| HENNIS WASHINGTON, FREDRICK GREEN, TODD HOOKS, KELEEN FARRIER, LAWRENCE SILAR, DARYL LINDSEY, ROBERT EDWARDS, JOHNNY BALDWIN, BOBBY TERRY, TIMOTHY CALDWELL, NICK WHITFIELD, and JIMMY CURRY, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO. 1:13-CV-610-WKW [WO] |
| UTILITY TRAILER MANUFACTURING COMPANY, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Before the court are twelve motions for summary judgment filed by Defendant Utility Trailer Manufacturing Company (UTM)—one as to each of the twelve Plaintiffs, all current or former employees of UTM.  (Docs. # 54, 56, 58, 60, 62, 64, 66, 68, 70, 72, 74, 76.)[1]  Plaintiffs, who are black, bring this lawsuit alleging a racially hostile work environment under 42 U.S.C. § 1981 and state law causes of

---

[1] All references in this opinion to page numbers are to those pages assigned by CM/ECF, as opposed to page numbers generated by the parties.

action.  Every Plaintiff has conceded summary judgment as to all state law claims. (Docs. # 87–96, 98–99.)  And UTM does not request summary judgment on the § 1981 claims of Plaintiffs Hennis Washington, Daryl Lindsey, and Nick Whitfield. (Docs. # 72, 74, 76.)  Thus, the court will examine the federal claims of nine Plaintiffs only: Johnny Baldwin, Robert Edwards, Fredrick Green, Lawrence Silar, Bobby Terry, Keleen Farrier, Todd Hooks, Jimmy Curry, and Timothy Caldwell. Upon consideration of the parties' arguments, the evidence, and the relevant law, all twelve of UTM's motions are due to be granted on the state-law claims, and, as to the § 1981 claims, seven of UTM's motions are due to be granted, while two are due to be denied.

## II.  JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  The parties do not contest personal jurisdiction or venue.

## III.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820

(11th Cir. 2010).  However, such inferences are drawn only to the extent supportable by the record.  *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

## IV.  BACKGROUND & PROCEDURAL HISTORY

UTM is one of the oldest and largest over-the-road trailer manufacturing companies in the United States.  It has been in business since 1914 and currently operates five plants across the United States.  In 1981, UTM opened a factory in Enterprise, Alabama, which typically employs hundreds of workers.  The events giving rise to this action occurred at the Enterprise factory.  Plaintiffs, employees of UTM's Enterprise factory, filed this lawsuit against UTM on August 27, 2013, alleging a racially hostile work environment under § 1981 and asserting a host of state law claims.

The original complaint failed to allege facts specific to each Plaintiff, opting instead to list affected parties and make generalized allegations.  When UTM moved to dismiss the claims or, in the alternative, for a more definite statement (Doc. # 12), the court noted that "Plaintiffs' complaint is poorly pled" and expressed its "confusion as to what this case is about" (Doc. # 14, at 1–2).  The court ordered Plaintiffs to file a more definite statement "to allege how the work environment was racially hostile to each plaintiff" but declined to dismiss any of the claims.  (Doc. # 14, at 2–3.)

On October 18, 2013, Plaintiffs filed an Amended Complaint (Doc. # 16), which contained a section for each Plaintiff, listing what appeared to be specific allegations beneath each Plaintiff's name.  But the sections all turned out to be virtually identical.  UTM moved for dismissal a second time.  (Doc. # 18.)  Ruling on the motion, the court observed that, although "the First Amended Complaint alleges facts for each plaintiff individually[,] . . . the individual allegations are, for the most part, identical for each plaintiff and are simply copied and pasted twelve times."  (Doc. # 25, at 3.)  Nevertheless, the court gave Plaintiffs another shot, declining once again to dismiss the claims and instead ordering them to "file a Second Amended Complaint addressing the deficiencies noted [in the court's order]."  (Doc. # 25, at 16.)  This was Plaintiffs' "final opportunity."  (Doc. # 25, at 10.)

A Second Amended Complaint was filed on July 14, 2014.  (Doc. # 26.)  This time, UTM moved to dismiss Plaintiffs' state law claims only and did not challenge the federal law claims.  (Doc. # 29.)  On December 15, 2014, the court denied the motion, noting that, although it was a "close call," the court was "reluctant to dismiss the claims at the pleading stage."  (Doc. # 39, at 8.)  This was the final set of dispositive motions prior to the pending motions for summary judgment.[2]

---

[2] Plaintiffs responded to UTM's motions for summary judgment with briefs that, in large part, are identical.  Seven of the nine responses are between twenty-five and twenty-eight pages long, the vast majority of which (including the facts sections) are copied and pasted wholesale from one brief to the next with little differentiation other than the name of the plaintiff.  (Docs. #

The proposed evidence of racial hostility varies. Some of Plaintiffs' evidence focuses on the hiring and/or promotional practices of UTM.[3]  For example, at least since 1999, UTM has not hired a black employee to a senior management position. (Docs. # 90, at 5; 102, at 8–9.)  Plaintiffs also point out that UTM failed to promulgate a harassment policy expressly prohibiting racial harassment until 2012.[4] (Doc. # 90, at 5–6.)  And Plaintiffs suggest that the lack of reporting procedures prior

---

90–96.)  The next two briefs have the same twenty-five or so pages but also include an additional section that addresses those plaintiffs' unique bankruptcy-related issues.  (Docs. # 98, 99.)  The final three briefs are the only ones that are not largely identical to the others, and that is because UTM did not move for summary judgment as to those plaintiffs' discrimination claims.  (Docs. # 87–89.)

The court has given Plaintiffs opportunity after opportunity to demonstrate the merits of their claims.  Despite repeatedly being told to individualize their allegations, Plaintiffs continue to employ the same copy-and-paste techniques that consistently have earned them the court's chidings.  As an example, the first page of each of the first nine briefs includes the same hollow refrain: "To be clear from the outset, [insert Plaintiff's name here] is not relying solely on the experiences of others and gossip to make his case."  (Docs. # 90, at 3; 91, at 3; 92, at 3; 93, at 3; 94, at 3; 95, at 3; 96, at 3; 98, at 3; 99, at 3.)  Ironically, most of the briefs go on to do exactly that. Now, at the summary judgment stage, the court must decide whether—on the strength of the generalized allegations in their collective complaint, nine virtually identical briefs, and a voluminous record developed mostly by UTM—Plaintiffs have presented enough evidence to hold that a genuine dispute of material fact exists as to each § 1981 claim.  A few have.  Many have not.

[3] Plaintiffs have not indicated how these employment practices fit within the paradigm of a hostile work environment claim.  However, to the extent these policies might contribute to a racially abusive work environment, the court considers them in the way Plaintiffs have characterized them: as part of the hostile work environment claims.

[4] All parties agree that a written policy was in place from 1995 to 2012, which prohibited "using profane, obscene or abusive language, [or] threatening, intimidating, [or] coercing others," and declared equal opportunity for "hire, assignment, and advancement without regard for race, color, creed, sex, national origin, age, or disability."  (Doc. # 78-12, at 30, 39.)  In 2012, prior to the filing of this lawsuit, UTM disseminated an updated employee handbook expressly prohibiting *racial* harassment and providing a complaint procedure for victims.  (Doc. # 78-12, at 41, 46–48.)

to 2012 effectively made UTM blind to workplace harassment against its black employees.[5]  (Doc. # 90, 5–6.)

Most of what Plaintiffs offer to support their hostile work environment claims involves harassment perpetrated by coworkers.  Plaintiffs report essentially three kinds of harassment that allegedly contributed to the hostile environment: racial graffiti and other suggestive images; overtly racist slurs; and racial comments or innuendos.  In assessing any particular plaintiff's claim, the court does not consider inadmissible hearsay, *Macuba v. DeBoer*, 193 F.3d 1316, 1322 (11th Cir. 1999), or conduct to which the plaintiff was oblivious, *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1245 (11th Cir. 2014).  Thus, specific allegations are plaintiff-dependent and will be explained in detail.  Generally, if one Plaintiff's claim is merely copied and pasted into another Plaintiff's brief, without an explanation as to how or why it pertains to the claims of the proffering Plaintiff, the court does not consider it.

## V.  DISCUSSION

To establish a hostile work environment claim under § 1981[6], an employee must prove that "the workplace is permeated with discriminatory intimidation,

---

[5] They make this suggestion while maintaining that, on several occasions prior to 2013, employees reported harassment to a supervisor or to H.R. (*See, e.g.,* Doc. # 90, at 6.)

[6] Hostile work environment claims "are subject to the same standards of proof and employ the same analytical framework," whether brought under § 1981 or Title VII.  *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).  Title VII decisions are, therefore, instructive for the analysis of Plaintiffs' § 1981 claims.

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotation marks and citations omitted). When the harassment claim is based on race, the employee must prove five elements:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability.

*Adams*, 754 F.3d at 1248–49.

UTM challenges the fourth element only. The fourth element requires a plaintiff to show that his work environment was subjectively and objectively hostile. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). In other words, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.* (quoting *Harris*, 510 U.S. at 21–22). The U.S. Supreme Court has emphasized "that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Onscale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). The "mere utterance of an ethnic or racial epithet," even where directly aimed at the plaintiff, is not sufficient. *Rogers*

*v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971).   Conversely, "environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers" can create the requisite level of hostility, even where the plaintiff is not the direct subject of the harassment.   *Id.* "The fact that many of the epithets were not directed at [the plaintiff] is not determinative."   *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982).   But the plaintiff must have been aware of the epithet during his or her employment. *See Adams*, 754 F.3d at 1245, 1257–58 (setting forth the requirements for the admissibility of "me too" evidence to prove that a work environment is objectively hostile).   In other words, the totality of the plaintiff's circumstances does not include instances of racial abuse of which the plaintiff "learned only after [his or her] employment ended or what discovery later revealed."   *Id*. at 1245 ("[A]n employee alleging a hostile work environment cannot complain about conduct of which he was oblivious for purposes of proving that his work environment was objectively hostile.").

Notwithstanding *Onscale*'s totality-of-the-circumstances approach, four factors have emerged as particularly relevant to the inquiry of whether the harassment is objectively severe: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with

an employee's job performance." *Mendoza*, 195 F.3d at 1246 (citing *Harris*, 510 U.S. at 23).  Because UTM's motions for summary judgment specifically challenge the objective hostility element of plaintiffs' claims[7], the *Harris* factors will control.

## A.   Harassment Experienced by Plaintiffs in *Adams v. Austal*

In a case remarkably similar to this one, the Eleventh Circuit applied the *Harris* factors to the claims of multiple employees.  *See Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d at 1250–57.  In *Adams*, the Eleventh Circuit reviewed thirteen district court orders granting summary judgment against plaintiffs who had all brought hostile work environment claims but had been exposed to varying degrees of racial harassment in the workplace—affirming some and vacating others.  *Adams* is the perfect analogue for the case at bar.[8]  Racial graffiti and a series of firsthand

---

[7] It will be assumed for purpose of the analysis of the fourth element that each Plaintiff subjectively perceived the workplace racial harassments as severe and pervasive.

[8] Given the immense factual variety of cases on this topic, readers more predisposed to cynicism than charity might conceivably accuse the court of cherry-picking cases.  In the interest of staving off such accusations, a few clarifications are in order.  Courts look at "all the circumstances" in determining whether an environment is hostile, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993), such that the relevant metric is the sum total of racial harassment experienced by a given plaintiff.  However, as might be expected in any complex factual inquiry that considers the totality of the circumstances, the presence of especially severe bouts of harassment makes a plaintiff's remaining burden easier to bear.  In some cases, particularly ones that are factually diverse, this can make it appear as if courts are applying the law inconsistently.  For example, in *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012), the circuit reversed a district court's decision granting summary judgment in favor of a defendant whose employee had sued for race discrimination on a § 1981 hostile work environment theory.  The employee, who was black, based his claim on: four incidents in which he found bananas left on his truck; the appearance of Confederate flag paraphernalia in the workplace; a couple of racially suggestive comments; and an after-hours confrontation with two co-workers.  *Id.*  By and large, the discrimination he suffered was milder, it might seem, than the harassment suffered by several of the plaintiffs in *Adams* whose claims did not survive.  Thus, the cynic might aver that the Eleventh

and secondhand comments predominate the claims there as they do here.  And, like the Plaintiffs in this case, some of the *Adams* plaintiffs experienced racial harassment that was much more frequent, severe, and direct than others.  The *Adams* court's meticulous and individualized factual analysis helps delineate the threshold requirements of a hostile work environment claim.  The court thus relies heavily on the Eleventh Circuit's analysis in *Adams* in parsing Plaintiffs' claims here.

A closer look at the facts in *Adams* is worthwhile.  The racial graffiti noted by the *Adams* court was extensive and vulgar.  The following phrases were written or inscribed on bathroom walls at the *Adams* plaintiffs' workplace:

> "see, niggers travel in packs just like monkeys"; "[t]he only people wearing union shirts are the lazy-ass niggers"; "[h]ow do you keep ten niggers from raping your wife, give them a basketball"; "white is right"; "why don't niggers use aspirin? Because they don't want to pick the cotton off the top"; "I'm not a full-fledged white man until I split the raw, black oak"; "KKK is getting bigger"; "[h]ow do you starve a nigger to death? Hide his food stamp card in his work boots."

---

Circuit is applying the law inconsistently and that a comparison to *Adams*, rather than *Jones*, makes it more difficult for a plaintiff to succeed.

But this view of the cases ignores an important detail that distinguishes *Jones* from cases like *Adams* and this case; *Jones* involved one very severe bout of harassing conduct.  The plaintiff in *Jones*, after reporting the bananas and comments to his manager, was met after work by two Confederate-flag-wearing co-workers who confronted him for talking with management about the harassment.  *Id.* at 1290.  It was dark; the plaintiff was outnumbered; and one of the co-workers brought a crowbar, presumably to send an implicit threat.  *Id.*  Harassment that reasonably can be construed as a physical threat, even when infrequent, carries much weight in the hostile work environment context.  *See Harris*, 510 U.S. at 23 (holding that the relevant factors, other than frequency, include the "severity" of the conduct, "whether it is *physically threatening* or humiliating," and "whether it unreasonably interferes with an employee's work performance," all of which are intensified by physical threats).  Thus, *Jones* and *Adams* combine for the proposition that direct physical threats weigh heavily in favor of finding a hostile work environment.  Because plaintiffs in this case did not experience physical threats, their claims are more similar—on the whole—to the claims of the plaintiffs in *Adams*.

754 F.3d at 1246. The plaintiffs in *Adams* also alleged that they saw white supervisors and coworkers calling them or other black employees "boy," "monkey," or "Jeffrey." *Id.* Several employees displayed Confederate flag paraphernalia and used the slur "nigger" on occasion, though usually not directed at the plaintiffs. *Id.* at 1246, 1253–55.

At times, the harassment became physically threatening. While the *Adams* plaintiffs worked at Austal, employees found a total of eight nooses left around the workplace. *Id.* at 1246. One plaintiff heard a white coworker say that "where he [is] from, they hang . . . niggers," *id.* at 1253, and another plaintiff overheard a white employee say to a comrade that "h[e] and a nigger got into it" and that he would "hang that nigger, and shoot that nigger," *id.* at 1255. When one of the plaintiffs complained about his supervisor carving the slur "porch monkey" into the side of a ship they were working on, the supervisor "got in [his] face, less than an inch from [his] lips, screaming and hollering," and told him that "he [the supervisor] wasn't a goddamn racist." *Id.* at 1253–54.

Terrible as this harassment was, the court affirmed summary judgment against several plaintiffs who did not directly experience some of the more severe harassment. Although each *Adams* plaintiff saw the graffiti and was present for other harassing incidents, many of them were not direct victims of racial harassment themselves. The court distinguished those against whom summary judgment was

11

appropriate by singling out the plaintiffs whose experiences were less frequent and less severe than the others.  For example, although Robert Adams and Rahman Pratt both "frequently saw the racist graffiti in the men's restroom and frequently saw the Confederate flag," their experiences were not "directly humiliating or threatening," and were thus less severe than the experiences of others.  *Id.* at 1254–55.  *Cf., e.g., id.* at 1251–52 (vacating summary judgment where black female plaintiff saw racist and sexually suggestive graffiti on the bathroom wall *that was directed at her* and personally found a noose in the breakroom).  Adams heard the slur "nigger" several times during his time at Austal, and Pratt was the plaintiff who overheard a coworker say he would "hang that nigger, and shoot that nigger."  *Id.*  But the conduct in both instances was infrequent, not perpetrated by a supervisor, and not directed specifically at either plaintiff.  *Id.*  The other conduct that plaintiffs heard about, but did not experience firsthand, was not severe enough to create a hostile work environment for those who were not direct victims.  *See id.* at 1253 (noting, in reference to another plaintiff, that "his experience was less severe because he did not see [the racist incident] firsthand").  Thus, as to the plaintiffs mentioned above and several others, the court affirmed summary judgment, noting in each case that "a reasonable jury would not find that his work environment was hostile."  *See, e.g., id.* at 1254.

Applying the *Harris* factors and comparing the harassment experienced by the employees at UTM to that of the plaintiffs in *Adams*, the court concludes that some Plaintiffs have presented sufficient evidence of an objectively hostile work environment to survive summary judgment, while others have not.

**B.    Harassment Experienced by Plaintiffs in this Case**

**1.    *Johnny Baldwin***

The record does not present a genuine dispute of material fact concerning Plaintiff Johnny Baldwin's work environment.  Baldwin has worked at UTM since December 1992.  Like many of the plaintiffs in this case, Baldwin predicates his claim on three types of racial harassment: (1) graffiti found in the workplace; (2) isolated incidents involving racially charged comments; and (3) a long list of comments that he "became aware" of through secondhand (or, in some instances, third-hand) accounts.  Baldwin's narrative describes a workplace that falls far short of the ideal and a pattern of behavior that the court condemns unequivocally; however, the experiences he proffers do not provide enough evidence for a reasonable jury to conclude that his work environment was racially hostile according to this circuit's standard.  Because the other Plaintiffs rely primarily on the same events to establish their claims, Baldwin's case will act as the paradigm for the rest of the claims going forward.

### a. Graffiti

Baldwin relies in part on racial graffiti found in work bathrooms to show that his work environment was objectively hostile. There were four instances of graffiti Baldwin could remember seeing: an illustration of a "hangman's noose" that had been etched into a bathroom door; the acronym "KKK" written in black permanent marker on a bathroom wall; the words "Brotherhood strikes the first blow" in pen or pencil on a bathroom wall; and a drawing of a Confederate flag, which was also in pen or pencil on a wall or door in the bathroom. (Doc. # 78-8, at 37–40.) Moreover, Baldwin reports seeing the word "brotherhood" and images of confederate flags on t-shirts and/or bumper stickers. (Doc. # 78-8, at 39–40.)

The *Adams* court affirmed summary judgment against several plaintiffs who saw much worse. Unlike the graffiti in *Adams*—which displayed explicit racial slurs, derisive phrases directed at blacks, and messages that the average person could interpret to be physically threatening—the graffiti here was less pervasive and less severe. Not only did the graffiti in *Adams* contain highly offensive slurs and messages, whereas the graffiti here was suggestive, it also contained a far greater number of messages that occurred at a much higher frequency. The *Adams* plaintiffs on eight different occasions found ropes, looped-and-knotted to look like nooses, left throughout their workplace, whereas Plaintiffs in this case found a crudely carved illustration of a noose on the bathroom wall. *Adams*, 754 F.3d at 1246. The

former is clearly more threatening and severe.  Yet, despite dealing with much more severe conditions in the way of graffiti, the court in *Adams* affirmed summary judgment against several plaintiffs, establishing that graffiti—even very severe graffiti—is not enough to establish a genuine dispute of material fact that a plaintiff's work environment was objectively hostile.  The court held that certain plaintiffs who had seen the graffiti, but had been exposed only sporadically to slurs and other racist comments, did not make a sufficient showing.  *See, e.g.*, *id.* at 1254 (explaining that one plaintiff "heard about the noose in the breakroom," "frequently saw the racist graffiti . . . [and] Confederate flag," heard "the slur 'nigger'. . . a few times," but lacked the pervasiveness and severity required to support a claim for hostile environment).  Assessed next to the graffiti to which these plaintiffs were exposed, the graffiti Baldwin relies on is mild.  To be successful, Baldwin's hostile work environment claim would have to include other conduct that, when considered in the totality of the circumstances, is both more severe and more direct than the graffiti mentioned above.

### b.    Firsthand Comments

Factoring in the comments Baldwin heard (and heard about) does not bring his claim up to par.  Baldwin admits that no racist comments or slurs were ever

directed at him during the relevant period.[9]  (Doc. # 78-8, at 35.)  And, when asked how many times he witnessed a racist comment firsthand, Baldwin can list only two occasions.  (Doc. # 78-8, at 35–36.)  In the first, he heard a white female coworker continuously refer to a black coworker as a "little boy."  (Doc. # 78-8, at 36.) According to Baldwin, she said, "[Y]ou should have heard that little boy, the way he was cursing out there.  You should have heard that little boy.  He just kept going on and on.  That little ole boy.  He's something else."  (Doc. # 78-8, at 36.)  In the second instance, Baldwin heard an unidentified voice over the radio say, "monkey in the ring."  (Doc. # 78-8, at 54–55.)  Judging from the voice, a coworker suggested that the comment was made by Jeff Kilpatrick; based on the fact that Kilpatrick, a

---

[9] Mr. Baldwin does report being called "DAN," which he says means "damn ass nigger," by a coworker prior to the year 2000.  (Doc. # 78-8, at 37.)  However, this allegation falls far outside the applicable statute of limitations.  *See* 28 U.S.C. § 1658 (creating a four-year statute of limitations for civil actions arising under Acts of Congress enacted after December 1, 1990); *see also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004) (holding that hostile work environment claims based on racial harassment brought under § 1981 arise under the Civil Rights Act of 1991, and thus are subject to the § 1658 limitations).

Although the U.S. Supreme Court has enunciated a so-called "continuing violation" theory of hostile work environment claims, whereby acts falling outside the limitations period are actionable if part of a larger pattern of racial harassment consisting of actionable conduct, *see National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), these facts are not susceptible to such doctrine.  Baldwin has not alleged any conduct occurring between 2000 and 2010.  It cannot be that allegations separated by a period of ten years—more than twice the limitations period— are considered "part of the same actionable hostile work environment practice," even if there is no intervening conduct connecting the new allegations to the old.  Otherwise, long-tolled claims based on long-forgotten conduct could be revived by a single recent act.  This surely is not what the Supreme Court intended.

There are too few actionable allegations to support the theory that UTM's work environment has been continuously hostile since before 2000, when these comments last occurred. Thus, Baldwin cannot establish that the "DAN" comments are "part of the same actionable hostile work environment practice."  *See Morgan*, 536 U.S. at 120.  Accordingly, the court does not consider them as part of the claim.

white coworker, had been working with Lawrence Silar that day, Baldwin assumed the comment was made in reference to Silar, who is black.  (Doc. # 78-8, at 55.)

Workplace references to black employees as "boys" or "monkeys" can contribute to a racially hostile work environment.  Context is key.  *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) ("The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."); *see also Jones*, 683 F.3d 1297 (describing scenarios where use of the term "monkey" is a racial insult).  Here, the word "boy" itself is innocuous, and there are insufficient facts from which to infer that the white co-worker's use of the word "boy" was intended as a racial insult.  There is also little detail about the context in which the singular "monkey in the ring" phrase was said, who said it, and why.  Nevertheless, even if it is assumed that both comments were racially motivated, they do not cure the deficiencies of Baldwin's claim.  Several of the claims in *Adams*, despite being markedly stronger than Baldwin's, were not up to scratch.  *See, e.g., Adams*, 754 F.3d at 1254 (granting summary judgment against plaintiff who frequently saw severely racist graffiti and heard the slur "nigger" several times in the workplace).  This being the case, then *a fortiori* neither is Baldwin's claim sufficient, absent other facts creating a hostile work environment under all the circumstances.

### c.    Secondhand Comments ("Me too" Evidence)

To round out his claim, Baldwin points to incidents that he says he learned of from coworkers but that he did not hear himself, *i.e.*, "me too" evidence.  First, Baldwin heard that white coworkers and supervisors had used the slur "nigger"; however, he "can't remember who" told him this, and he did not name the alleged offending coworkers or supervisors.  (Doc. # 78-8, at 49.)  Second, Baldwin learned that Rick Medley, a supervisor, had said "nigger-rigging" in the workplace.  (Doc. # 78-8, at 36, 48–49.)  Although Baldwin said James Morrow told him about Medley's statement (Doc. # 78-8, at 50–51), Baldwin relies upon the deposition testimony of Caldwell (Doc. # 90, at 9), and Medley has admitted that he made the statement to Caldwell (Doc. # 78-16, at 26).  Third, a coworker, Darryl Lindsey, told Baldwin that a white co-worker said, "[F]looring is a black man's job."  (Doc. # 78-8, at 50.)  Although Baldwin testified that Lindsey "didn't say who said it" (Doc. # 78-8, at 50), Lindsey's deposition testimony is in the record, and Lindsey testified that Enorris Martin is the one who made the statement to him (Doc. # 78-3, at 10).

Fourth, Plaintiff Lawrence Silar told Baldwin that Barbara Owens said, "I don't like his [Silar's] black ass.  It gives me the creeps."   (Doc. # 78-8, at 50; *but see* Doc. # 78-10, at 49, in which Silar testifies that he did not hear the statement directly from Owens, but rather that Becky Hutto told him that Owens had made the "black ass" statement about him.)  Fifth, James Morrow told Baldwin that two white

employees, Walt Johnson and Tony Parish, had a conversation in which one of them said, "All them black boys out there, they must be meeting with their lawyer."[10] (Doc. # 78-8, at 50–51.)  Sixth, Baldwin heard that a white supervisor, Fred Tipton, had referred to lubricant as "monkey pee," but Baldwin did not identify who told him about Tipton's comment.  (Doc. # 78-8, at 49.)  Seventh, he was "pretty sure" he had heard about racial jokes being told at the workplace but could not remember for certain.  (Doc. # 78-8, at 37.)  Eighth, in his summary judgment response, Baldwin cites incidents of racial slurs recounted by his co-Plaintiffs (*e.g.*, Doc. # 90, at 6, 7, 9), but he has not pointed to any evidence in the record indicating when or how he learned of these comments.

A threshold issue is whether these secondhand (and thirdhand) statements are inadmissible hearsay.  In their summary judgment briefing, the parties give short-shrift to the multi-faceted hearsay issues at play in this litigation.  (*See*, *e.g.*, Doc. # 55, at 30 (Baldwin's brief); Doc. # 90, at 23 (UTM's brief).)  The admissibility of the above statements impacts what evidence can be considered to assess the totality of Baldwin's circumstances; therefore, it must be determined whether the statements

---

[10] There are some discrepancies between Plaintiff's recital of the evidence in his summary judgment brief and the evidence itself.  The evidence of course is what matters for opposing summary judgment and is the source cited in this opinion.  This incident is one example where Baldwin's narrative of the evidence (*see* Doc. # 90, at 11) does not align with Baldwin's deposition testimony.

can hurdle the multiple evidentiary obstacles to their admissibility.   The lack of briefing on hearsay has hampered this analysis.

Federal Rule of Civil Procedure 56 requires that affidavits or declarations submitted in opposition to a motion for summary judgment "be made on personal knowledge, *set out facts that would be admissible in evidence*, and show that the affiant or declarant is competent to testify on the matters stated."   Fed. R. Civ. P. 56(c)(4) (emphasis added); *see also Macuba*, 193 F.3d at 1323 ("[Rule 56(c)(4)] also applies to testimony given on deposition.").  With limited exceptions, hearsay is "not admissible" in evidence.  Fed. R. Evid. 802; *see also* Fed. R. Evid. 801(c) (defining "hearsay" as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Accordingly, this circuit has long recognized that "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba*, 193 F.3d at 1322 (internal footnote omitted).   Reflecting upon Rule 56(e),which is now set forth in Rule 56(c)(4), the court in *Macuba* held that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form."  *Macuba*, 193 F.3d at 1323.  These phrases—"reduced to admissible evidence at trial" and "reduced to admissible form"—elude clear grasp. *Macuba* offered this explanation:

> [C]ourts have used the phrases "reduced to admissible evidence at trial" and "reduced to admissible form" to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

193 F.3d at 1323–24.  The *Macuba* court illustrated that the phrase "reducible to admissible form at trial" is correctly applied where on summary judgment a plaintiff submits the testimony of a doctor, "which could later be given in an admissible form (by the doctor testifying at trial)."  *Id.* at 1324 n.18.

Citing *Macuba*, the Eleventh Circuit in a later case similarly explained that "[t]he most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (providing that an affidavit "can be reduced to admissible form at trial by calling the affiant as a witness" (citation and internal quotation marks omitted)).  Another way that testimony can be reduced to admissible form at trial is where the deponent or affiant does not offer the declarant's hearsay statement to prove the truth of the matter asserted.  For example, in litigation alleging a race-based hostile work environment claim, where, at his deposition, the plaintiff testifies that he heard a coworker say "John is a dumb n-----," the plaintiff's testimony likely will have a proper trial purpose that is not excluded by the hearsay rule.  This plaintiff, who has personal knowledge of the

statement, can offer it to show the effect the statement had on the plaintiff's perception of his work environment.  In this scenario, the plaintiff is not offering the statement to show the truth of the statement, *i.e.*, that John is a "dumb n-----."  *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (holding that, in a hostile work environment case, the plaintiff's attestation that a coworker told her that there was a contest to see who could have sex with the plaintiff first was admissible for the effect that it had on the plaintiff and not for the statement's truth, *i.e.*, that there actually was such a contest).  Because the statement would be admissible at trial for a limited purpose, the plaintiff's deposition testimony recounting the declarant's hearsay statement also is proper evidence for purposes of opposing a summary judgment motion.

But here Baldwin did not hear the alleged racially abusive statements; he wants to rely on what others told him that they heard.  This adds another level of declarants to the mix, and each level must fit within an exception or exclusion from the hearsay rule.  *See* Fed. R. Evid. 805 (providing that "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule").  To illustrate again, suppose that, in support of his hostile work environment claim, a plaintiff wants to testify that A told him that B called C a "black thief."  The statement by B likely is not hearsay if the plaintiff is not submitting it for the truth of the matter asserted, but only for its effect

on the plaintiff's perception of his work environment.  However, when retold by A to the plaintiff, B's statement is being offered to show that B *really said* what A claims he said, *i.e.*, to show that A is being truthful.  The admissibility of A's statement, if offered through the plaintiff-deponent, depends on whether there also is an exception or exclusion for this second level of hearsay.  In other words, the court must ask whether each level of hearsay would be admissible at trial were the plaintiff to take the stand and testify about what Larry said Moe said.  *See Howley v. Town of Stratford*, 217 F.3d 141, 154–55 (2d Cir. 2000) (observing that the plaintiff's testimony that other co-workers told her about the harassing statements would likely be inadmissible to prove that the statements were actually made because the plaintiff's "testimony offered for that purpose would be hearsay").

The Eleventh Circuit has recognized that the hypothetical plaintiff above has another avenue he could take at summary judgment to show that the evidence—A's statement about what he heard B call C—could be reduced to admissible form at trial.  The plaintiff could offer A's deposition testimony or affidavit on the matter.  In *Macuba*, the Eleventh Circuit noted that, at the summary judgment phase, a district court correctly applied the phrase "reducible to admissible form at trial" by "refusing to consider hearsay when [the] offering party did not provide [an] affidavit from the declarant."  *Macuba*, 193 F.3d at 1324 n.18 (citing *Marshall v. Planz*, 13 F. Supp. 2d 1246, 1255 (M.D. Ala. 1998)).  In *Marshall*, the plaintiff "relie[d] upon

his own deposition testimony that [Declarant B] told him that [he] had heard [Declarant A] make the . . . accusation," but the testimony was inadmissible at summary judgment because the plaintiff "d[id] not proffer any testimony by [Declarant B] himself . . . ." 13 F. Supp. 2d at 1256; *see also Cooper v. John D. Brush & Co.*, 242 F. Supp. 2d 261, 270 (W.D.N.Y. 2003) ("While hearsay racist comments not directed at plaintiff or even his particular race may be probative of a hostile work environment, such evidence must be produced by plaintiff in admissible form. Here, plaintiff has not provided an affidavit from the co-worker who allegedly heard this statement." (internal citations omitted)). Under *Macuba*'s teachings, A's summary judgment affidavit or deposition testimony could be reduced to admissible form at trial. Trial testimony by A, on his personal knowledge, that he heard B call C a "black thief" would not be offered to prove the truth of B's statement about C but only to prove that B made the statement about C.

In light of the foregoing principles, the court turns to Baldwin's evidence. The second incident (the "nigger-rigging" statement) meets the *Macuba* standard. Medley's deposition testimony is part of the summary judgment record, and Medley has admitted that he made the statement to Caldwell. (Doc. # 78-16, at 26.) Thus, Medley can be called to testify about his statement. Baldwin also can call Caldwell, whose deposition testimony is part of the record. The court considers Medley's statement because there is testimony in the record from witnesses with personal

knowledge of the statement whom Baldwin can call to testify at trial.  This incident, therefore, will be considered at summary judgment for its effect on Baldwin's perception of his work environment.

The third incident also passes muster.  Baldwin can call Silar, who has personal knowledge of the racial statement (*i.e.*, "[F]looring is a black's man job.").  Silar's deposition testimony recounting the statement is in the record, and there is no indication that Silar will not testify in conformity.  At trial, when elicited through Silar, the statement has a permissible purpose to show the effect of the statement on the plaintiff, who later learned of the statement from Silar.

The other incidents fail to overcome evidentiary obstacles.  As to the first incident, Baldwin recounted at his deposition that he knows neither who made the racial slurs nor who told him about the slurs.  Because he has not identified any declarant whatsoever, it is futile to delve any further into the hearsay analysis.  *See Jones*, 683 F.3d at 1294 (citation omitted) (observing that, while the plaintiff "might attempt to prove that [secondhand hearsay] statements were made by putting on testimony of witnesses who have personal knowledge of the alleged racial statements," the record "contains no indication of any witness with personal knowledge who will testify [to this] at trial"); *id.* ("The possibility that unknown witnesses will emerge to provide testimony on this point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial.");

*Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[A]bsent a showing of admissibility—and none was forthcoming here—appellant may not rely on rank hearsay, whether or not embodied in an interrogatory answer, to oppose proper motions for summary judgment."); *Henry v. Colonial Baking Co. of Dothan*, 952 F. Supp. 744, 750 (M.D. Ala. 1996) ("[T]he mere possibility that the hearsay statement will be presented in the form of admissible evidence at trial [through a potential witness suggested by counsel at the pretrial hearing] d[id] not warrant consideration of the hearsay evidence at the summary judgment stage."). The seventh incident consisting of "racial jokes" suffers the same fate because Baldwin no longer remembers which coworkers told him about the jokes or who those unidentified coworkers said originally uttered them.

The fourth incident ("black ass" comment) likewise will not suffice to oppose summary judgment. Stringing together the sources of the statements, Silar testified at his deposition that Becky Hutto told him (Silar) that she heard Barbara Owens refer to him (Silar) as "his black ass" (Doc. # 78-10, at 49); Silar subsequently told Baldwin about Owens's comment (Doc. # 78-8, at 50). In his summary judgment brief, Baldwin relies on his own testimony and on Silar's deposition testimony for the admissibility of Owens's comment. (Docs. # 78-10, at 49; 78-8, at 50.) However, both Baldwin's and Silar's testimony contain multiple levels of hearsay. For example, Silar testified that he did not hear the "black ass" comment himself but

26

heard about it secondhand from Becky Hutto.  (Doc. # 78-10, at 49.)   Although Silar's testimony is in the record, Hutto's is not.  Thus, this statement will not be considered.

Turning to the fifth incident ("boys" statement), Baldwin identifies Morrow as the declarant who heard the offending statement made by Johnson and/or Parish; however, Baldwin has not offered deposition testimony or an affidavit from Morrow. UTM has objected to Morrow's testimony, when elicited through Baldwin, as hearsay (Doc. # 55, at 26), and Baldwin has not shown how, if he were on the stand at trial, his own testimony about what Morrow told him would satisfy an exception or exclusion to the hearsay rule.  The statement, thus, cannot be considered at summary judgment.

Concerning the sixth incident, Baldwin cannot remember who told him Tipton referred to lubricant as "monkey pee."  (Doc. # 78-8, at 49.)  With this lapse in memory, Baldwin has not pointed to any evidence indicating that the statement could be reduced to admissible form at trial.  Baldwin himself cannot take the stand at trial and testify to Tipton's alleged statement of which he (Baldwin) has no personal knowledge.  *See* Fed. R. Civ. P. 56(c)(4); *Jones*, 683 F.3d at 1294 ("The possibility that unknown witnesses will emerge to provide testimony [of the hearsay statement] is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial.").  And this court is not required to do the work of counsel and

"wade through and search the entire record for some specific facts which might support the nonmoving party's claim." *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal citation and quotation marks omitted).

Finally, the eighth category of evidence (consisting of racial slurs that other Plaintiffs heard), Baldwin has not cited any evidence that demonstrates that he learned about the slurs during the relevant time period of the hostile work environment, rather than solely during discovery.   Because an evidentiary foundation is lacking for this "me too" evidence, these statements cannot be considered.  *See Adams*, 754 F.3d at 1245 ("[A]n employee alleging a hostile work environment cannot complain about conduct of which he was oblivious for the purpose of proving that his work environment was objectively hostile.").

In sum, the only comments for which Baldwin identifies a declarant with personal knowledge of the statement and whose corroborating testimony is in the record are the second and third incidents (concerning the "nigger-rigging" comment and the statement that "flooring is a black man's job").  The court considers these two secondhand statements in the totality of the circumstances.[11]   As to these statements, hearing about harassment is less severe than experiencing harassment

---

[11]  Moreover, going forward, the court considers those hearsay statements retold by Plaintiffs in their deposition testimony that are supported by the testimony of the declarants who have personal knowledge of the offending statements and who, thus, can be called to testify at trial about these statements.

directly.  *See Harris*, 510 U.S. at 23 (factors); *see also, e.g., Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 n.2 (7th Cir. 2011) ("In the context of a hostile work environment claim, secondhand harassment is less severe than firsthand harassment.").  Secondhand accounts that survive the hearsay analysis should be weighed accordingly.

Under the totality of the circumstances, Baldwin fails to raise a genuine dispute of material fact that the harassment he experienced or knew about was frequent, severe, or humiliating him directly.  Although Baldwin claims to have been exposed frequently to racist graffiti, the messages contained in the graffiti at UTM were mild compared to the vulgar messages and epithets contained in the graffiti relied upon by several of the *Adams* plaintiffs, and much less frequent than in *Adams*. Yet, summary judgment was affirmed against those plaintiffs in *Adams*.  Likewise, with all reasonable inferences drawn in Baldwin's favor, the comments he heard firsthand were mild, and it is difficult to see how any of them could have been humiliating to Baldwin personally, since no comment was ever directly addressed to him.  The secondhand evidence does not add much to his claim.[12]  Thus, a reasonable jury could not find that Baldwin's work environment was objectively hostile.

---

[12] On this record, even if the court were to consider the other secondhand incidents of rank hearsay, the outcome would be the same.

## 2.   *Robert Edwards*

Robert Edwards has been employed by UTM off and on since 1999.  The harassment he experienced was similar to that experienced by Baldwin.  In his deposition and briefing, he noted much of the same graffiti, but he added that "[a]ll the ones [he] saw got painted over."[13]  (Doc. # 78-18, at 25.)  *See Adams*, 754 F.3d at 1254 (treating an employer's practice of "regularly clean[ing]" racial graffiti as mitigating the severity of the alleged hostile work environment).  He also heard a white coworker say "flooring is a black man's job."  (Doc. # 78-18, at 38.)  As for racial slurs, the only time Edwards reports personally hearing anyone use the slur "nigger" was when a black coworker "said it to hi[m]self" and Edwards just "happen[ed] to hear it."  (Doc. # 78-18, at 6–7.)  As to the secondhand accounts where white employees allegedly used the slur (or the variation "nigger-rigging"), those are less severe than hearing the slur directly.  Compared to one of the plaintiffs in *Adams*, who heard a white coworker and a white supervisor use the slur "nigger," but against whom summary judgment was affirmed nonetheless, 754 F.3d at 1254–55, the harassment Edwards experienced was mild.

---

[13] One detail mentioned by Edwards and not by Baldwin was that the word "nigger" had been written on a bathroom wall at least three different times.  (Doc. # 78-18, at 38.)  Each time it was written, UTM would "go back and spray paint it off and clean it up."  (Doc. # 78-18, at 39.) In evaluating Edwards's claim, the court considers this along with the rest of the graffiti already mentioned by Baldwin.

Other secondhand accounts relayed to Edwards cannot be considered on summary judgment because they consist of hearsay statements of either unknown declarants or declarants whose testimony is not in the record. *Macuba*, 193 F.3d at 1323. For example, Edwards says he heard "through the grapevine" that one coworker called another "my nigger" (Doc. # 78-18, at 23), but he does not recall who told him of the incident. He also alleges that a coworker said, "I'll slap you black like Daryl" (referring to another black employee), but again cannot recall how he learned of the incident. (Doc. # 78-18, at 37.) Finally, he alleges that a white coworker made a noose at the plant but admits that he did not see the noose personally and could not recall how the incident came to his attention, again calling it "grapevine information." (Doc. # 78-18, at 41.) These prototypical examples of rank hearsay cannot be considered on summary judgment.

Edwards does describe one instance in which a white coworker called him "boy" in what appears to be an angry, condescending way. (Doc. # 78-18, at 35–37.) However, one isolated incident of personally experienced discrimination, even when coupled with graffiti, is not enough to rise to the level required to establish a hostile work environment. As with Baldwin, the graffiti was mild on the whole; UTM painted over the racist messages whenever they were reported; and Edwards cannot recall a single time in which he heard a white coworker use a racial slur.

Considering all the circumstances, a reasonable jury could not find his work environment objectively hostile.

### 3. *Fredrick Green*

Fredrick Green worked at UTM from January 12, 2012, to October 9, 2013. Although Green testified that he saw some of the racial graffiti, he did not see a depiction of a noose.  (Doc. # 78-4, at 35 ("[T]he only thing I s[aw] personally was the brotherhood thing[,] . . . [and a] couple of times I s[aw] the KKK written in bathrooms.").)  Thus, his claim is weaker, at least in regard to graffiti, than the previous two Plaintiffs.  And, while he reported hearing *about* workplace usage of racial slurs, like Edwards, he only once heard a slur himself.  (Doc. # 78-4, at 35.) His claim is based primarily on secondhand accounts of racism and a series of comments that he heard firsthand.

Green relies on four firsthand events and a more general description of workplace language to support his claim.  First, Green recalls that a white coworker once told him a joke that involved racial insinuations and the use of a slur.  (Doc. # 78-4, at 40.)   When asked about the allegation during his deposition, Green mentioned that the coworker prefaced the joke by saying that he did not "really mean nothing by it" but that he wanted to tell it because "he thought it was funny."  (Doc. # 78-4, 40.)  Second, Green describes a lunchtime conversation with another white coworker who told him about a black man that he had hired to help out in his

firewood business.  The coworker said the man was "doing quite well" at his job, which Green interpreted to mean that the coworker was "surprise[ed] . . . that [the man] was doing so well being a black guy."  (Doc. # 78-4, at 40.)  Third, Green reports that a white coworker once "jokingly" told him that his "black ass" needed to bring in biscuits for everyone.  (Doc. # 78-4, at 41–42.)  And fourth, Green explains that he would sometimes hear white colleagues refer to black men as "boys," which he took to be condescending.  (Doc. # 78-4, at 42.)

Green also heard secondhand reports of racial comments, some of which cannot be considered to oppose summary judgment.  For example, Green recalls hearing about a white employee who said that a black coworker "looked like a gorilla on a motorcycle," but he could not remember who told him of the incident.  (Doc. # 78-4, at 30.)  The court thus does not consider this statement.  *See Jones*, 683 F.3d at 1294 ("The possibility that unknown witnesses will emerge to provide testimony on [a particular] point is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial.").

However, several of the secondhand statements Green mentions will be considered.  For example, Green mentions being "aware" of harassment against Lawrence Silar (Doc. # 78-4, at 44), which included use of the slur "nigger" and about which Silar has testified during the course of discovery (Doc. # 78-10, at 16, 29, 49, 52).  In a similar vein, Green mentions awareness of Medley's "nigger-

rigging" statement, which other Plaintiffs have testified that they witnessed and which Medley admits he made. Because the secondhand reports of these incidents have identifiable declarants whose corroborating testimony also is in the record, the court considers them, albeit for the less effective purpose of showing secondhand "awareness," rather than direct experience, of harassment.

As with Baldwin and Edwards, Green's evidence in its totality is not sufficiently severe or pervasive on the whole. Like Edwards, Green cannot recall an occasion in which a white coworker directed a racial slur at him. The incidents Green actually experienced, in which coworkers told jokes or made insensitive remarks, are troublesome and should not be condoned in the workplace, but they are insufficiently severe or frequent to be grounds for a hostile work environment claim, even when considered cumulatively. Green's admission that his coworkers, for instance, "mean[t] nothing by" their comments and "never did anything maliciously" suggests an overall lack of hostility that, in the absence of more severe harassment, precludes a finding in Green's favor. (Doc. # 78-4, at 40, 43.) A reasonable jury could not find that his work environment was objectively hostile.

### 4. *Lawrence Silar*

The record presents a genuine dispute of material fact as to whether Lawrence Silar's work environment was objectively hostile. Lawrence Silar has worked at UTM since May 14, 2012, with the exception of a five-month period in 2013 during

which he was laid off due to a lack of work at the plant.  In addition to regularly viewing the same racial graffiti mentioned by the other Plaintiffs, Silar presents evidence that he was subjected to direct racial harassment "daily" by Barbara Owens, a white co-worker, until finally she was terminated on August 14, 2013. (Doc. # 78-10, at 52.)  Silar claims to have been called "nigger" and "black ass" repeatedly.  On another occasion, Owens told him to stay "out back . . . where you belong."  (Doc. # 78-10, at 52.)  Owens said to him, "Nigger, get your black ass out [from] in front of me," and asked, "what's your black ass doing here?"  (Doc. # 78-10, at 16, 52.)   And, on one occasion another white coworker, Enorris Martin, approached Silar—unprovoked—and said, "I'm a big white guy.  You're a monkey." (Doc. # 78-10, at 29.)  When Silar asked Martin why he called him a "monkey," Martin said, "I hate black men[]."  (Doc. # 78-10, at 29.)  Silar also testified that Martin called him a "monkey" more than twice.  (Doc. # 78-10, at 29.)

A reasonable person in Silar's position, "considering all the circumstances," could find the harassment experienced by Silar, as presented in the record, to be both severe and pervasive to the point of interfering with his job performance.  *See Onscale*, 523 U.S. at 81.  In contrast to those Plaintiffs who passively viewed graffiti and heard about incidents experienced by others, Silar was personally harassed in the workplace daily by two white coworkers whose conduct reflects outright racial animus.  Moreover, Martin's self-proclaimed description as a "big white guy,"

coupled with his declared hatred for blacks, could be construed by a reasonable person as physically threatening.  Thus, a reasonable jury could find Silar's work environment objectively hostile.

### 5.   *Bobby Terry*

The evidence Terry presents is insufficient to establish a genuine dispute of material fact that Terry's work environment was objectively hostile.  Terry has been employed with UTM since 1989.[14]  Although he was laid off temporarily twice in his first three years with the company, he has enjoyed continuous employment with UTM at least since 1993.  Terry reports having seen graffiti in the breakroom and bathroom, including "nigger," "DAN," "KKK," and rebel flags.  (Doc. # 94, at 14.) He also reports having heard a handful of racially charged comments.  For example, he heard a white coworker tell a black coworker that he would "beat his black ass" and "beat him as black as Daryl."  (Doc. # 94, at 13.)  Another time, he heard a white coworker call Plaintiff Silar a "black ass nigger."  (Doc. # 94, at 11.)  And Terry claims to have heard white individuals at work refer to black men as "boys," which he believes to be derogatory.

The majority of Terry's evidence comes from secondhand remarks that he did not witness.  Even if it is assumed that these secondhand statements meet the

---

[14] Although he had been employed with UTM for nearly 25 years by the time he filed this lawsuit, most of the allegations of racial harassment come after 2012.  (*See* Doc. # 26, at 45–50.) As will be mentioned later, Terry admits in his deposition testimony that several other allegations relate to incidents that occurred many years ago.

*Macuba* standard for consideration at summary judgment, *see supra* at 20–25, they collectively lack the severity or pervasiveness to create a hostile work environment. For example, Jimmy Curry told Terry that a coworker said "[blacks] are not the minority any more, Mexicans [are]" (Doc. # 94, at 12), and Johnny Baldwin told him that another coworker said Terry "[gave] her the creeps" (Doc. # 78-1, at 40). Terry also heard from James Morrow that an employee had remarked that "the black guys got it messed up in the plant." (Doc. # 78-1, at 41.) The most severe secondhand remark was the "nigger-rigging" incident, which Terry heard about from a coworker, Nick McClendon. (Doc. # 78-1, at 18.) Although use of the word "nigger" is severe, the rest of the comments merely reference race.

Under the totality of the circumstances, a few racially charged comments (most of which are secondhand), two slurs, and graffiti do not establish a hostile work environment claim under this circuit's standard, especially when many of the incidents are too old to be actionable. The racial graffiti, for example, was not a pervasive issue capable of interfering with a reasonable person's work environment. Terry admitted that he had not seen "DAN" and "nigger" written on a bathroom wall in 10 years "since the old bathroom was torn down" (Doc. # 78-1, at 26), and that "nothing [has] been on the bathroom wall for about a year" (Doc. # 78-1, at 30), so both recency and frequency are lacking. Nor were the comments sufficiently severe or pervasive to change the conditions of Terry's employment. Although the use of

a racial slur is severe, a slur "was [never] directed toward [Terry] or directly humiliating or threatening to him," *Adams*, 754 F.3d at 1255, and he witnessed a coworker use the slur "nigger" only once. The other statements, even if it is assumed that they implicitly refer to race, are less severe than uses of an explicit racial slur, and their severity is further dampened when they are offered via secondhand accounts. Considering the evidence together, a reasonable jury could not find Terry's work environment objectively hostile.

### 6.   *Keleen Farrier*

Farrier has failed to present evidence establishing a genuine dispute of material fact that his work environment was objectively hostile. With the exception of a four-month period in 2013, Keleen Farrier was employed with UTM from August 2012 to March 2014. During his employment, Farrier reports seeing graffiti in the bathrooms, including the words "nigger" and "KKK," and drawings of a stick figure hanging from a noose and rebel flags. (Doc. # 78-9, at 30–31, 53–54.) He also reports being called "boy" by a few coworkers. (Doc. # 78-9, at 30.) At least three times, one of Farrier's white coworkers, Tommy Marler, "g[o]t in [Farrier's] face," angrily called him a "boy," and on the third occasion also "pushed" him "once, like he wanted to fight," causing Farrier to "stumble[ ] back a little bit." (Doc. # 78-9, at 43, 46–47.) Following the third incident, UTM conducted an investigation and terminated Marler's employment shortly thereafter. (Doc. # 78-9, at 47.)

The rest of what Farrier relies on is secondhand information.  Over the course of his fifteen months at UTM, Farrier heard about five incidents in which a racial slur was used, four of which will be considered.  Two of those, which were mentioned by other Plaintiffs (and have been covered in previous sections of this opinion), were the "nigger-rigging" incident and the verbal harassment of Silar. (Doc. # 78-9, at 29, 50–51.)  The other two admissible secondhand reports involve Becky Hutto's interactions with Hennis Washington, who told Farrier about the interactions and the slurs after the fact, and whose deposition testimony is in the record.  (Docs. # 78-9, at 50, 52; 78-5, at 41.)  Finally, Farrier heard that a named supervisor said "niggers aren't allowed out here," but he cannot remember who told him.  (Doc. # 78-9, at 51.)  With no identifiable declarant upon whose testimony the court may rely, this last secondhand statement is inadmissible hearsay and cannot be considered.

The evidence, considered in its totality, is not enough to meet the threshold for a hostile work environment claim.  As in Terry's case, Farrier reports seeing each instance of graffiti only a few times, which is too infrequent to be pervasive, and in each case UTM painted over the graffiti when it appeared.  *See Adams*, 754 F.3d at 1254, 1255 (weighing as part of the totality of the circumstances the fact that the employer regularly removed the graffiti); (Doc. # 95, at 14.)  Also, although some of the harassment Farrier endured is severe, the coworker primarily responsible for

the harassment was terminated for his conduct, a detail that weighs against the proposition that Farrier's work environment was objectively hostile.[15]

The repeated use of the racial slur "nigger" is severe.  *See Adams*, 754 F.3d at 1255 ("[T]he use of the slur 'nigger' is severe . . . .").  However, there is no evidence that an employee directed the slur to Farrier.  And, with one exception, the evidence he proffers that the word was used is secondhand.  In his brief opposing summary judgment, Farrier claims to have "heard other white employees use the term 'nigger' 2–3 other times."  (Doc. # 95, at 12.)  But arguments in a brief are not evidence. When deposed, he only reports hearing *about* the use of the word from other employees.  (*See* Doc. # 78-9, at 30 (where Farrier is asked whether he has "heard someone, directly with [his] own ears, use the word ["nigger" or "nigga"] at the Utility Trailer plant" and replies, "[n]ot to my knowledge.").)  This will not support the conclusion that Farrier's work environment was objectively hostile, even when combined with the graffiti.  *See Adams*, 754 F.3d at 1254 (affirming summary judgment against a plaintiff, Adams, who "frequently saw the racist graffiti," "heard [the slur 'nigger'] only a few times over several years," and did not offer evidence that "anyone directed it toward him").

---

[15] If an employer's removal of racially harassing graffiti mitigates the severity of the graffiti's effect on its employees, *see Adams*, 754 F.3d at 1254, then there is no reason the same rationale would not apply to an employer's removal of a racially harassing employee.

The most serious evidence weighing in Farrier's favor is the pushing incident with Tommy Marler. Although the physical altercation would be threatening to a reasonable person, UTM's prompt investigation and termination of Marler mitigated the continuing effect of the incident on Farrier's work environment. Moreover, the threat involved here (a possible fistfight) is less severe than the threat involved in *Jones* (a crowbar beating) and less clear than the one made by Enorris Martin (the "big white guy" who "hate[s] black men[].")  Marler and Farrier worked on the same welding projects at UTM, and Marler's outbursts occurred at times when they had been working together. (*See* Doc. # 78-9, at 44 (describing that when Farrier and Marler would "work[] together on . . . a trailer," "[Marler would] start at one end and [Farrier would] start at the other end" and they would "weld until [they], essentially, met in the middle").) There is little in the record to suggest that Marler's anger was the result of racial bias and not work-related "frustrat[ion]." (*See* Doc. # 78-9, at 45 (where Farrier testified that Marler would "get frustrated . . . about the trailer" and would "take it out on [Farrier]").) Ultimately, although Farrier may have felt threatened at the time of the push in much the same way Silar did, the threat to Farrier was not as clearly racial, and the rest of his cumulative case is much weaker than Silar's. One isolated incident involving a physical threat will not cure an otherwise deficient claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[I]solated incidents (unless extremely serious) will not amount to

discriminatory changes in the 'terms and conditions of employment.'"). Although the combined evidence shows an environment with sporadic racism, one that is far from perfect, it does not show one in which racial abuse permeated the workplace. A reasonable jury could not find Farrier's work environment objectively hostile.

### 7.   *Todd Hooks*

The record presents a genuine dispute of material fact that Hooks's work environment was objectively hostile. Todd Hooks has been employed by UTM since May 2, 2011. To support his claim, he relies on racially charged comments and slurs, secondhand reports of the same, some racial graffiti, and the occasional appearance of confederate flags.

Most of Hooks's allegations revolve around a single UTM supervisor: Ricky Medley, who is white. Hooks heard Medley do all of the following: say "nigger" two or three times (Doc. # 78-20, at 46); refer to him as "boy" seven to ten times (Doc. # 78-20, at 46–47); and remark on one occasion that an individual was "so black you couldn't see him in the dark unless he smiled" (Doc. # 78-20, at 44). He also heard Medley on several occasions tell a military story that involved use of the slur "nigger," although Medley tried to clarify that he did not "mean [anything] by it." (Doc. # 96, at 11.) But Medley was not the only white employee he heard make racially charged comments. Hooks also witnessed white coworkers make disparaging remarks about a black coworker on three other occasions—*e.g.*, calling

one employee a "black ass motherf-----" and saying "I don't like his black ass." (Doc. # 96, at 11–12.)  Finally, while at work, Hooks would regularly see racial graffiti and images of the confederate flag.  (Doc. # 96, at 13–14.)

Other harassment Hooks heard about through secondhand accounts.  From coworkers, Hooks heard about the "nigger-rigging" incident, which involved Medley, and he also heard about other incidents in which a black coworker was called a "monkey" and an "uppity nigger."  (Doc. # 78-20, at 48–49.)  With one exception (the "uppity nigger" slur), he identifies declarants who have testified about each statement.  Thus, the court considers all but that one exception as part of the summary judgment record.

Considering the totality of the circumstances, Hooks's claim is a close call. The harassment he endured was more direct than that nearly all of his co-plaintiffs experienced.  Although he was never *directly* called "nigger," Hooks's white supervisor repeatedly called him "boy," which is a condescending way to refer to a black man, and on occasion he used the word "nigger" in reference to other people or in jokes.  Even if the misfortune never befell him personally, Hooks still was forced to witness in the workplace several of his black comrades being called "nigger."  Even if being referred to as "boy" seven to ten times since 2011 is not deemed "frequent," the remarks were direct, severe, and perpetrated by a person with authority—one who remains employed at UTM.  This kind of harassment from a

43

supervisor, coupled with the graffiti and admissible secondhand reports, rises to a level sufficient to create a genuine dispute of material fact.   Accordingly, a reasonable jury could find Hooks's work environment objectively hostile.

### 8.   *Timothy Caldwell & Jimmy Curry*

Because of pending bankruptcy proceedings, Plaintiffs Caldwell and Curry face the prospect of summary judgment not only for the inadequacy of their hostile work environment claims but for an additional reason: judicial estoppel.

The doctrine of judicial estoppel precludes parties from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (quoting 18 James Wm. Moore et al., *Moore's Federal Practice* § 134.30, p. 134–62 (3d ed. 2000)).  It is invoked at the court's discretion, *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001), and "is designed to prevent parties from making a mockery of justice by inconsistent pleadings," *Am. Nat'l Bank of Jacksonville v. Fed. Dep. Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983).  In deciding whether to apply judicial estoppel, courts in the Eleventh Circuit contemplate two elements: (1) "it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding"; and (2) "such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Salomon Smith Barney, Inc. v. Harvey*, 260 F.3d 1302, 1308 (11th Cir. 2001).  This second prong is satisfied

when the party asserting estoppel demonstrates that the inconsistency involved "intentional contradictions, not simple error or inadvertence." *Burnes*, 291 F.3d at 1286. Such "deliberate or intentional manipulation can be inferred from the record." *Id.* at 1287. Indeed, this circuit has adopted the Fifth Circuit's assertion that "the debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment." *Id.* (quoting with approval *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999)); *see also Barger v. City of Cartersville*, 348 F.3d 1289, 1296 (11th Cir. 2003) (confirming that the Eleventh Circuit in *Burnes* adopted the rule from *Coastal*).

The issue is whether the doctrine of judicial estoppel bars Caldwell and Curry from pursuing their hostile work environment claims, such that summary judgment is appropriate. Upon examination, this circuit's prevailing law compels summary judgment.[16] Although Caldwell and Curry both argue that judicial estoppel should not apply, neither denies satisfaction of the first prong. First, Caldwell admits that his claims against UTM were pending when he filed for bankruptcy and that he failed to acknowledge the lawsuit in his original filings. (Doc. # 78-19, at 52.) Second, Curry's court records show (Doc. # 78-6, at 87), and he admits (Doc. # 78-6, at 10–

---

[16] The doctrine will be revisited by the Eleventh Circuit *en banc* following an oral argument in February 2017. *See Slater v. U.S. Steel Corp.*, 820 F.3d 1193 (11th Cir. 2016), *rehearing en banc granted*. However, the court applies the law as it stands now.

11), that two weeks after filing his lawsuit against UTM, he affirmed under oath at a confirmation hearing that he had no pending claims.  Thus, there is no question that the first prong is satisfied.

As for the second prong, the court is warranted in inferring intentional misrepresentation by Caldwell from the record.  Caldwell argues that judicial estoppel should not apply because (1) he amended his bankruptcy pleadings to include the UTM lawsuit, and (2) he had "no incentive to fail to list" his claims against UTM because doing so "subjects him to the possibility of totally losing [them]."  (Doc. # 99, at 35.)  Neither assertion is credible.  As the Eleventh Circuit made clear in *Burnes*, allowing litigants to escape the undesirable estoppel effects by amending their pleadings "would only diminish the necessary incentive to provide the bankruptcy court with a truthful disclosure of the debtors' assets."  291 F.3d at 1288.  The purpose of the doctrine is to encourage truthfulness in court proceedings and prohibit parties from "changing positions according to the exigencies of the moment," *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010), *i.e.*, when they get caught.  Caldwell's suggestion would have the opposite effect.  The Eleventh Circuit is not in the business of creating perverse incentives, and neither is this court.  Thus, litigants may not avoid judicial estoppel simply by amending their inconsistent filings.  Caldwell's first argument fails.

Caldwell's second argument also strains credulity.  He insists that he had "no incentive" to misrepresent his assets in bankruptcy proceedings because doing so could cause him to lose his claims.  (Doc. # 99, at 35.)  But when a litigant clearly has something to gain by keeping the bankruptcy court in the dark, it is reasonable to conclude that doing so was intentional.  *See Burnes*, 291 F.3d at 1287 (holding that a finding of inadvertence is appropriate only when the debtor has *no motive to conceal* or lacks knowledge of claims).  Caldwell had a motive—a potential recovery in the present action.  Unfortunately for him, pointing out the inherent risks involved in breaking the rules is not enough to compel a different conclusion.  Thus, because Caldwell has not argued a lack of knowledge about his pending claims, the second prong is satisfied as to him.  *See id.*

Curry loses on the second prong for the same basic reason.  Somewhat more persuasive is Curry's argument that the voluntary amendment of his bankruptcy filings, *before the estoppel issue arose in the instant litigation*, is evidence that he did not intend to defraud the bankruptcy court.  However, this argument ignores the Eleventh Circuit's pronouncement that a finding of inadvertence is appropriate "*only when*, in general, the debtor *either* lacks knowledge of the undisclosed claims *or* has no motive for their concealment." *Id*. (emphasis added).  For thinking better of his misrepresentations nine months after making them, Curry perhaps deserves a pat on the back.  But, in law, as on the playground, sometimes there are no takebacks.  His

change of heart does not undo the fact that he had already made an affirmative misrepresentation to the bankruptcy court with knowledge of his claims against UTM and with sufficient motive (a potential cash recovery) to conceal.  He presents no evidence to support a contrary conclusion.  Thus, application of judicial estoppel is appropriate.

Because judicial estoppel is appropriate as to both of the above plaintiffs, the court does not reach the merits of their hostile work environment claims.

### 9.   *Daryl Lindsey, Hennis Washington, & Nick Whitfield*

UTM has not moved for summary judgment against the § 1981 claims of Plaintiffs Lindsey, Washington, and Whitfield.   Accordingly, their federal law claims survive and will proceed to trial.

## VI.  CONCLUSION

In accordance with the foregoing, it is ORDERED:

1.     The following motions are GRANTED in their entirety: Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Johnny Baldwin (Doc. # 54); Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Robert Edwards (Doc. # 56); Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Frederick Green (Doc. # 58); Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Bobby Terry (Doc. # 62); Defendant Utility Trailer

Management's motion for summary judgment against Plaintiff Keleen Farrier (Doc. # 64); Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Timothy Caldwell (Doc. # 68); and Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Jimmy Curry (Doc. # 70).

2.    The following motions are GRANTED as to the state law claims only and DENIED as to the federal discrimination claims: Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Lawrence Silar (Doc. # 60); and Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Todd Hooks (Doc. # 66).

3.    The following motions, which pertain only to the relevant plaintiffs' state law claims, are GRANTED in their entirety: Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Daryl Lindsey (Doc. # 72); Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Hennis Washington (Doc. # 74); and Defendant Utility Trailer Management's motion for summary judgment against Plaintiff Nick Whitfield (Doc. # 76).

Claims that remain for trial are the § 1981 federal discrimination claims of Plaintiffs Lawrence Silar, Todd Hooks, Daryl Lindsey, Hennis Washington, and Nick Whitfield.

DONE this 8th day of March, 2017.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE